## In re BLOOMBERG.

District Court, D. Minnesota, Fifth Division.
April 9, 1931.

J. J. Courtney, of Duluth, Minn., for petitioners.

A. R. Smythe, of Duluth, Minn., for trustee.

**636**

SANBORN, District Judge.

It would serve no useful purpose to state in detail all of the facts shown by the record, which is quite voluminous. The bankrupt herself is twenty-two years old and a clerk in a store in Duluth. She lives at home with her father, Sam Bloomberg, and her mother. Her father managed the business of the Rothschild Shirt Shop, and she was merely the nominal proprietor. He left Rumania when he was about fourteen years old, came to Minneapolis in 1901 or 1902, where he went into the restaurant business with a brother, and then came to Duluth shortly afterwards, where he went into the clothing business. After the store burned in which he was department manager, he became a salesman for Richman Clothes, and in March, 1929, opened up the Rothschild Shirt Shop. For a time he operated other stores in and near Duluth. It is claimed that he received goods for these stores on consignment from the Manhattan Woolen Mills and then sold them. He had an arrangement with the woolen mills for a 5 per cent. commission on the sales. His stores, aside from the one in Duluth, were subsequently taken over by the Boston Mills, a subsidiary of the Manhattan Mills, and he was made the buyer for the Boston Mills. The Manhattan Mills was a concern operated by a Mr. Cohen. Mr. Cohen and Mr. Bloomberg were closely associated in business. When Mr. Bloomberg reached a point where he could not or would not pay the creditors of the Rothschild Shirt Shop, he sent out first a circular letter asking the creditors for an extension of time. Thereafter an involuntary petition in bankruptcy was filed against his daughter; and thereupon, and before schedules were filed, he gave to Mr. Cohen a list of all of the creditors with the amounts of their claims and their addresses, and Mr. Cohen sent to them a circular letter stating that he was a creditor, and that he was anxious that the creditors should receive as large dividends as possible, and soliciting powers of attorney. Mr. Bloomberg called up a large number of the outside creditors on the long-distance telephone and requested them to send powers of attorney to Mr. Cohen. It is apparent that at that time Mr. Cohen and Mr. Bloomberg believed that they could put through a composition with the creditors of the Shirt Shop. At the first meeting of creditors, Mr. Cohen had powers of attorney from a majority of creditors, both in number and amount. The offer of composition was not accepted, and thereupon the creditors proceeded to the election of a trustee. Certain of the creditors objected to Mr. Cohen's voting the claims for which he held powers of attorney, on the ground that these had been procured through the active solicitation and interference of the bankrupt. He voted all of them for Mr. Paul A. Miller. The other creditors who were represented voted for Mr. E. G. Robie. The appointment of Mr. Miller was thereupon approved by the referee, in the following language:

"I will say this, that the action of Mr. Cohen in helping to save time in the administration of the estate, and his action in nominating a Trustee entirely disinterested, so far as any of the controversies in this proceeding are concerned, robs the charge of undue activity of the bankrupt of any particular sting. So that even if it was conceded that the bankrupt has been overly active, and that that had some disqualifying effect, I could not refuse, I do not believe at this time, to approve of the Trustee that Mr. Cohen has nominated. If there was any indication here that there was anything that should be investigated that would not be investigated by the party proposed, or if there should be any intimation at all that the bankrupt would be in any way able to cover up things through the connivance with the Trustee proposed by Mr. Cohen, I might use my discretion by disapproving of the selection. It just happens that Mr. Miller is in bed, and I do not know whether he has been consulted in this matter or not, but my relations with Mr. Miller have been such just as they have been with Mr. Robie, that I have entire confidence in him carrying out his duties as Trustee without fear or favor. Both Mr. Robie and Mr. Miller have been extremely satisfactory to work with, and I am really glad to appoint either one or the other rather than some outsider, so that I will approve this nomination and permit the votes of Mr. Cohen to be received and given full value. In view of this decision I will make no ruling on the objections of Mr. Smythe."

It is conceded by everyone that Mr. Miller is a man of high character and thoroughly qualified for the position of trustee. Mr. Cohen's activities and those of Bloomberg would appear to have been directed more to securing a composition with the creditors than to influencing the selection of a trustee friendly to the bankrupt or Bloomberg. The trustee, under the circumstances, contends that the approval of his appointment was a matter within the discretion of the referee, and that no abuse of that discretion is shown.

The rule applicable was stated by Judge

Lochren in the case of In re Hanson (D. C.) 156 F. 717, 718. There it appears that the referee, over objection, had approved the appointment of a Mr. Anderson as trustee. The court said:

"As even the objecting creditors freely admit that Mr. Anderson is a man of responsibility, integrity, and high standing, it seems unfortunate that his appointment was brought about by such improper interference on the part of the bankrupts as should have caused it to be disapproved. But it is well settled by all the authorities that the trustee represents the creditors, and not the bankrupt, in the administration of the estate; and that it is improper that the bankrupt shall actively interfere with the matter of his selection and appointment; and that, if he does interfere and the person aided by him is appointed by votes procured by such interference, the appointment should for that reason be disapproved. In re McGill, 106 F. 57, 45 C. C. A. 218; In re Rekersdres (D. C.) 108 F. 206; In re Henschel (D. C.) 109 F. 861.

"More cases to the same effect might be cited, and none to the contrary are found. The rule is a salutary one, and based on obviously sound reason. It often happens that it becomes the duty of the trustee to actively antagonize the bankrupt by efforts to discover secreted assets, or to set aside conveyances as fraudulent, or to recover preferences. There should be no color of basis for suspicion of any partiality or sense of obligation on the part of the trustee toward the bankrupt. Hence, however high the character of a proposed trustee may be, the active interference of the bankrupt in favor of his appointment will render him practically ineligible to appointment as trustee in that bankruptcy."

In re Lloyd (D. C.) 148 F. 92, 93, Judge Quarles said:

"By applying to the bankruptcy court, the bankrupt voluntarily surrenders all control over his estate, and the same passes to the officers of the law, under the act. Any effort on his part to control the selection of a trustee, or to shape any of the proceedings of the court, must be resented and rebuked. It is a pernicious intermeddling which cannot be too strongly condemned. Referees should be vigilant to detect, and take all lawful means to prevent, any such interference by the bankrupt in court proceedings. No attorney should be permitted to vote any claim that has come to him through the instrumentality of the bankrupt."

The same rule is either recognized or applied in the following cases: In re Lewensohn (D. C.) 98 F. 576; In re Rekersdres (D. C.) 108 F. 206; In re McGill (C. C. A. 6th) 106 F. 57; In re Machin (D. C.) 128 F. 315; In re Cooper (D. C.) 135 F. 196; Birmingham Coal & Iron Co. v. Southern Steel Co. (D. C.) 160 F. 212; In re Morris (D. C.) 154 F. 211; In re Sitting (D. C.) 182 F. 917; In re Ployd (D. C.) 183 F. 791; In re Kreuger (D. C.) 196 F. 705; In re Stowe (D. C.) 235 F. 463; In re Fisher (D. C.) 193 F. 104, 26 A. B. R. 793; In re White (C. C. A.) 15 F.(2d) 371; In re Stradley & Co. (D. C.) 187 F. 285; In re Rothleder (D. C.) 232 F. 398; Bollman v. Tobin (C. C. A. 8th) 239 F. 469; Petition of Safran (C. C. A. 1st) 275 F. 819; In re Day Lumber Co. (D. C.) 8 F.(2d) 146.

As a practical matter, I am satisfied that in this proceeding Mr. Miller could administer the estate as well as any other person, and that the creditors' interests might even be better subserved by him than by any other person, in view of the fact that he has now had charge of the estate for some two months. However, the complaint is not against him, but against the method used in securing his appointment. There is no question that Cohen, with the assistance of Bloomberg, solicited powers of attorney, and no question that Bloomberg himself solicited certain of the creditors to give powers of attorney to Cohen. Had it not been for Bloomberg's activities, there is no reason to suppose that Cohen could have controlled the appointment of a trustee. In no case should the appointment of a trustee ever be approved, regardless of who he is, when it appears that his selection has been, directly or indirectly, brought about by the bankrupt himself or those acting in his behalf.

The order approving the appointment of Mr. Miller is reversed, and the appointment disapproved.